# In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-2323

LAC COURTE OREILLES BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS OF WISCONSIN, RED CLIFF
BAND OF LAKE SUPERIOR CHIPPEWA INDIANS OF
WISCONSIN, and SAKAOGON CHIPPEWA COMMUNITY,
MOLE LAKE BAND OF LAKE SUPERIOR
CHIPPEWA INDIANS,

*Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA, UNITED STATES
DEPARTMENT OF THE INTERIOR, GALE A. NORTON,
Secretary of the Department of the Interior, et al.,

*Defendants-Appellees*,

JAMES E. DOYLE, Governor of the State of
Wisconsin and STATE OF WISCONSIN,

*Intervening Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 02 C 553—**Barbara B. Crabb**, *Chief Judge*.

_____

ARGUED JANUARY 16, 2004—DECIDED APRIL 29, 2004

_____

Before FLAUM, *Chief Judge*, and RIPPLE and ROVNER, *Circuit Judges*.

FLAUM, *Chief Judge*.    The Plaintiff Tribes appeal the district court's opinion and order declaring the gubernatorial concurrence provision of the Indian Gaming Regulatory Act ("IGRA") constitutional and not in violation of the federal government's trust obligation to Indians. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I.  Background

Plaintiffs are three federally-recognized Indian Tribes with reservations in sparsely populated areas of northern Wisconsin ("the Tribes"). While each of the Tribes operates a casino on reservation land, these casinos do not generate income comparable to casinos operated by tribes who have reservations near Wisconsin's urban centers or destination resorts. Seeking to advance their tribal and economic development, the Tribes joined together for the purpose of establishing a jointly owned and operated off-reservation gaming facility in a lucrative location.

The Tribes found a struggling pari-mutuel greyhound racing facility in Hudson, Wisconsin that they wished to acquire and convert into a casino gaming facility. Hudson was attractive to the Tribes because they believed its proximity to the metropolitan areas of Minneapolis and St. Paul and easy accessibility to Interstate Highway 94 would ensure a broad customer base. In October 1992 the Tribes formally submitted their application under the Indian Gaming Regulatory Act ("IGRA") 25 U.S.C. §§ 2701 *et seq.* to the Department of the Interior seeking to have the Hudson property taken into trust for their benefit for the purpose of operating a casino gaming facility.

The Secretary of the Interior has broad discretion to acquire lands in trust for the benefit of Indian tribes pur-

suant to Indian Reorganization Act of 1934, 25 U.S.C. § 465. However, this authority is limited by IGRA, which prohibits certain types of gaming on lands acquired in trust by the Secretary of the Interior after October 17, 1988 ("after-acquired lands"). 25 U.S.C. § 2719(a). The Tribes hoped that their application would be favorably received pursuant to 25 U.S.C. § 2719(b)(1)(A), an exception to IGRA's general ban on gaming on after-acquired lands. That exception provides that the general prohibition on gaming shall not apply where:

> the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination.

25 U.S.C. § 2719(b)(1)(A).

The Department of the Interior initially denied the Tribes' application, but later vacated the rejection following a lawsuit and settlement. In February 2001, the Department of the Interior issued findings that the proposal was in the best interests of the Tribes and would not be detrimental to the surrounding community. The Department of the Interior sent the matter to then- Governor of Wisconsin Scott McCallum for his concurrence. In May 2001, Governor McCallum issued a letter declining to concur in the Secretary's findings, citing Wisconsin's general disapproval of off-reservation gaming and public policy of permitting only "limited exceptions to the general prohibition against gambling." Governor McCallum opined that the public interest would not be served by the addition of another major casino gaming facility to the seventeen casino gaming

facilities already operating in Wisconsin. In June 2001, the Department of the Interior issued a final decision denying the Tribes' application on the grounds that, absent the Governor's concurrence, the exception provided in 25 U.S.C. § 2719(b)(1)(A) did not apply and 25 U.S.C. § 2719(a) precluded the acquisition of the land for the purposes of gaming.

The Tribes initiated this litigation in the United States District Court for the District of Columbia in May 2001 seeking a declaration that the gubernatorial concurrence provision of § 2719(b)(1)(A) was unconstitutional. The State of Wisconsin and Governor McCallum moved to intervene in July 2001. The Tribes moved for judgment on the pleadings in December 2001. The case was eventually transferred to the United States District Court for the Western District of Wisconsin in October 2002. The Tribes renewed their motion for judgment on the pleadings in November 2002, and both defendants filed cross-motions for judgment on the pleadings.[1] The Tribes filed an opposition to the defendants' motions in addition to a "conditional motion" to file a second amended complaint. The conditional motion requested that the Tribes be permitted to add a claim that Governor McCallum had relied on improper factors in refusing to concur, in the event that the court upheld the constitutionality of the gubernatorial concurrence provision of § 2719(b)(1)(A).

In April 2003, the district court granted the defendants' motions for judgment on the pleadings, finding that the gubernatorial concurrence provision is not an unconstitutional delegation of power, nor does it violate the separation of powers doctrine, the Appointments Clause, Art. II, § 2, or the Tenth Amendment. Further, the district court found

---

[1] James E. Doyle, the current Governor of Wisconsin, was substituted for Governor McCallum as the intervening defendant.

that the Tribes' claim that the gubernatorial concurrence requirement represented a breach of trust was barred by sovereign immunity and was without support in law. Finally, the district court denied the Tribes' conditional motion to amend, stating that it was untimely and futile. The district court subsequently denied the Tribes' Rule 59 motion to vacate the judgment and the Tribes now appeal. We uphold the judgment of the district court because we conclude that § 2719(b)(1)(A) does not violate separation of powers principles, the nondelegation doctrine, the Appointments Clause, principles of federalism, or the federal government's trust obligations to Indians.

## II.  Analysis

The Tribes challenge the constitutionality of the gubernatorial concurrence provision of the Indian Gaming Regulations Act ("IGRA"), 25 U.S.C. § 2719(b)(1)(A) on multiple grounds. The constitutionality of a federal statute is an issue of law subject to *de novo* review. *United States v. Hausmann*, 345 F.3d 952, 958 (7th Cir. 2003). When "it is fairly possible[,]" this Court is "to interpret the statute in a manner that renders it constitutionally valid." *Communications Workers of Am. v. Beck*, 487 U.S. 735, 762 (1988).

Following the Supreme Court's decision in *California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987), which held that Congress had not yet expressly granted the States jurisdiction to enforce state civil gaming regulations on Indian reservation land, Congress passed IGRA for the purpose of creating a federal regulatory scheme for the operation of gaming on Indian lands. 25 U.S.C. § 2702. IGRA states that the operation of gaming by Indian tribes is to serve "as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C. § 2702(1). IGRA recognizes that the States have an

interest in the regulation of gaming on Indian lands within their borders and allows state regulation of Indian gaming in two ways: (1) state criminal laws that prohibit gaming are enforceable on tribal lands, *see* 25 U.S.C. § 2701(5), and (2) Indian tribes who choose to engage in Class III gaming may do so only pursuant to a Tribal-State compact, *see* 25 U.S.C. § 2710(d)(1).[2]

At issue in this litigation is § 2719(b)(1)(A), which allows the Secretary of the Interior to deviate from IGRA's general prohibition of gaming on after-acquired lands if certain prerequisites are met. Under § 2719(b)(1)(A), the Secretary of the Interior may take land not contiguous to the reservation of the applicant Indian tribe into trust for the purpose of operating a gaming establishment if the Secretary finds that two factual predicates exist, namely, whether (1) "a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members," and (2) "would not be detrimental to the surrounding community," and if the "Governor of the State in which the gaming activity would be conducted" concurs in the Secretary's favorable determination. 25 U.S.C. § 2719(b)(1)(A).

### A.

The Tribes assert that the gubernatorial concurrence provision of § 2719(b)(1)(a) violates the separation of powers

---

[2] *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996) held that 25 U.S.C. § 2710(d)(7), which purported to authorize an Indian tribe to bring suit in federal court to compel a State to negotiate in good faith toward the formulation of a Tribal-State compact, violated the Eleventh Amendment. The Supreme Court held that the Indian Commerce Clause does not grant Congress the power to abrogate the States' sovereign immunity from suit. *Id.* at 48.

doctrine because it prevents the Executive Branch from executing the laws. In their view, § 2719(b)(1)(A) unconstitutionally diverts to the Governors of the 50 States the final decisional authority delegated by IGRA to the Secretary of the Interior. The Tribes submit that § 2719(b)(1)(A) requires a governor to review the Secretary of the Interior's analysis of the two factual predicates and empowers the governor to "veto" the Secretary of the Interior's conclusion by withholding concurrence. The Tribes cite *INS v. Chadha*, 462 U.S. 919 (1983) for the proposition that Congress cannot confer upon itself or an actor external to the federal Executive Branch the power to veto the President's execution of federal law.

At issue in *Chadha* was Section 244(c)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1254(c)(2), which authorized either House of Congress, by resolution, to veto the Attorney General's decision to suspend the deportation of a particular alien. The Supreme Court noted that the one-house veto served an "essentially legislative . . . purpose and effect," *id.* at 952, and was therefore subject to the procedural requirements for enacting legislation set forth in the Constitution: bicameral passage, U.S. Const. art. I, § 1, and presentment to the President, U.S. Const. art. 1, § 7, cl. 2. *Chadha*, 462 U.S. at 954-55. The Supreme Court concluded that none of the "four provisions in the Constitution, explicit and unambiguous, by which one House may act alone with the unreviewable force of law, not subject to the President's veto" applied to § 244(c)(2), and therefore concluded that the House of Representatives lacked authority under the Constitution to veto the Attorney General's decision to suspend the petitioner's deportation. *Id.* at 956-57. Finally, the *Chadha* Court noted that to maintain the separation of powers, "the carefully defined limits on the power of each Branch must not be eroded." *Id.* at 958.

Unlike the one-House veto provision at issue in *Chadha*, the gubernatorial concurrence provision does not prevent the Executive Branch from accomplishing its delegated function under IGRA. Section 2719(b)(1)(A) assigns the Secretary of the Interior two responsibilities: (1) to evaluate whether gaming on the proposed trust land would be in the best interest of the applicant tribe and not detrimental to the surrounding community; if so, then (2) to ascertain whether the Governor of the State where the proposed trust land is located concurs with his or her favorable determination. A governor's concurrence is no less a precondition to the Executive Branch's authority to waive IGRA's general prohibition of gaming on after-acquired lands than are the factual circumstances that give rise to Secretary of the Interior's conclusion that gaming on the proposed trust land would be in the Indian tribe's best interests and would not be detrimental to the surrounding community. Unless and until the appropriate governor issues a concurrence, the Secretary of the Interior has no authority under § 2719(b)(1)(A) to take land into trust for the benefit of an Indian tribe for the purpose of the operation of a gaming establishment.

The power delegated to the Attorney General in *Chadha* had no similar contingency predicate to the Attorney General's statutory authority to execute the law. The one-House veto wrested final decision-making power away from the Executive Branch over an issue that had been legislatively entrusted to the Attorney General and thereby directly impeded the Attorney General from accomplishing the function delegated: to determine whether to suspend, and to suspend, the deportation of a particular alien. In contrast, after the two preconditions to the Secretary of the Interior's authority are met—i.e., the two factual predicates exist and the governor issues a concurrence—the Secretary of the Interior's decision to execute § 2719(b)(1)(A) by taking the proposed land into trust is not subject to review.

We agree with the Ninth Circuit that § 2719(b)(1)(A) is an example of contingent legislation, wherein Congress restricted the authority to execute federal legislation contingent upon the approval of an actor external to the federal Executive Branch. *Confederated Tribes of Siletz Indians of Oregon v. United States*, 110 F.3d 688, 694-95 (9th Cir. 1997). As the Supreme Court established in *Currin v. Wallace*, 306 U.S. 1, 15 (1939), Congress may place "a restriction upon its own regulation by withholding its operation" unless a specified percentage of those affected by the regulation agree to submit to it. In *Currin*, the Supreme Court upheld a federal statute that authorized the Secretary of Agriculture to designate markets for the sale of tobacco, but only if two-thirds of affected tobacco growers favored the designation. *See also United States v. Rock Royal Co-op*, 307 U.S. 533, 577-78 (1939) (upholding provision conditioning Secretary of Agriculture's power to issue marketing orders contingent upon vote of producers); *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 407 (1928). Moreover, Congress may condition the operation of federal law on the approval of a state official. *See Parker v. Richard*, 250 U.S. 235 (1919) (upholding provision that conditioned the conveyance of certain Indian lands upon the approval of a state court). As in *Currin*, where the Secretary of Agriculture's authority was conditioned on a favorable vote of the affected farmers, the Secretary of the Interior's authority to act is conditioned on the concurrence of the relevant governor. This condition does not impermissibly interfere with the Executive Branch's execution of federal law, so much as its occurrence is a prerequisite to the Executive Branch's authority to act pursuant to § 2719 (b)(1)(A).

The Tribes contend that the contingent legislation rationale is an inappropriate analogy to § 2719(b)(1)(A) because that Section empowers governors to impose the force of law on Indian Tribes, who they characterize as

"unwilling third parties," whereas contingent legislation typically empowers the decision-maker to submit only itself to regulation. We agree with the Tribes that the statutes upheld in *Currin* and *Rock Royal* conditioned the power of the federal Executive on the approval of those subject to the proposed regulation, but we also conclude that the gubernatorial concurrence provision conditions the Secretary of the Interior's power on the approval of the appropriate party.

According to the Tribes, § 2719(b)(1)(A) regulates Indian tribes with reservations encompassed by the state where the proposed trust land is located. We disagree. The object of regulation under § 2719(b)(1)(A) is land that the Secretary of the Interior has taken into trust for Indians for the purpose of operating a gaming establishment. Before the land is taken into trust, it is within the jurisdiction of a state and is not yet subject to federal regulation under IGRA. Therefore, while the Secretary of the Interior investigates whether gaming on the proposed trust land "would be in the best interest of the Indian tribe" and "would not be detrimental to the surrounding community," the proper spokesperson for the land in question is necessarily a representative of the state where the land is located. It is only after the Secretary of the Interior determines that the proposed trust land meets the factual requirements of § 2719(b)(1)(A), the governor issues a concurrence, and the Secretary executes the federal law by taking the land into trust, that the Tribe enjoying that trust land becomes its appropriate representative. Thus, conditioning the Secretary of the Interior's power on the assent of the relevant governor is not unlike the contingent legislation in *Currin*, in that the proper spokesperson of the object of regulation—the land—is empowered to invite, or refuse, federal regulation.

We find that the remaining separation of powers issues illustrated by the one-House veto in *Chadha* are not

present here. The gubernatorial concurrence provision does not aggrandize the power of the Legislative Branch at the expense of the Executive Branch. The Secretary of the Interior would have no authority to permit gaming on after-acquired trust lands absent the power delegated by Congress in IGRA. Congress may, consistent with the doctrine of separation of powers, condition that delegation on the approval of an actor external to the Executive Branch. *See Currin*, 306 U.S. at 1. Congress has not wrongfully enhanced its power by the use of the contingent legislation mechanism; whether the governor concurs and thereby triggers the Secretary of the Interior's power under § 2719(b)(1)(A) is a circumstance outside of Congress's influence or control. *See Morrison v. Olson*, 487 U.S. 654, 694 (1988) (holding that the independent counsel provisions of the Ethics in Community Government Act do not violate separation of powers principles by impermissibly interfering with the functioning of the Executive Branch, when "Congress retained for itself no powers of control or supervision over an independent counsel").

Finally, the Tribes argue that § 2719(b)(1)(A) violates the separation of powers doctrine because it transfers control over the execution of federal law from the Executive Branch to the Governors of the 50 States, citing *Printz v. United States*, 521 U.S. 898 (1997). In *Printz*, at issue were certain interim provisions of the Brady Handgun Violence Prevention Act ("Brady Act"), 18 U.S.C. § 922, which obliged state law enforcement officers to conduct background checks of prospective handgun purchasers until a national system became operative. *Id.* at 903. The Supreme Court held that the interim provisions unconstitutionally transferred the responsibility of the President to "take Care that the Laws be faithfully executed," U.S. Const. Art. II, § 3, to the law enforcement officers of the 50 States, "who are left to implement the program without meaningful Presidential control." *Id.* at 922. The *Printz* Court noted that, by accom-

plishing the execution of the law through state officers, Congress had denigrated the President's power by circumventing the Executive Branch and had weakened the accountability and vigor of that Branch. *Id.*

Unlike the Brady Act's requirement that state officers temporarily execute federal law by performing background checks, the gubernatorial concurrence provision does not require or even permit any governor to execute federal law. The execution of § 2719(b)(1)(A) occurs when the Secretary of the Interior takes land into trust for the benefit of Indians for the purpose of operating a gaming establishment. IGRA does not empower any governor to perform that function. For example, even if a governor believed that taking land into trust for an Indian tribe for the purpose of gaming "would be in the best interest of the Indian tribe" and "would not be detrimental to the surrounding community," if the Secretary of the Interior disagreed, the governor would be unable to execute § 2719(b)(1)(A) by taking the land into federal trust.

As only the Secretary of the Interior may execute the § 2719(b)(1)(A) exception to IGRA's general prohibition of gaming on after-acquired land, the Executive Branch retains control over IGRA's execution, and therefore there is no *Printz* separation of powers problem. In conclusion, we hold that the contested provision of IGRA does not violate the separation of powers doctrine by interfering with the Executive Branch's execution of federal law.

## B.

We now turn to the Tribes' argument that Congress violated a related branch of the separation of powers jurisprudence: the nondelegation doctrine. In the Tribes' view, if § 2719(b)(1)(A) does not require a governor to decide whether to concur based on his or her analysis of the two factual predicates that bind the Secretary of the Interior's

determination, but instead directs each governor to select any standard on which to base the decision, then Congress has abdicated its duty to guide the execution of the law. *See Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 472 (2001) (*quoting J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)) (stating that Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform"). According to the Tribes, Congress failed to adequately constrain the discretion of the Governors, and § 2719(b)(1)(A) therefore requires the Governors to establish Congressional policy, in violation of U.S. Const. Art. 1, § 1.

The Supreme Court has explained that the nondelegation doctrine generally prohibits Congress from delegating its legislative power to another Branch of the federal government. *Mistretta v. United States*, 488 U.S. 361, 372 (1989). We conclude that the nondelegation doctrine is not implicated by the provision at issue because § 2719(b)(1)(A) does not delegate any legislative power to the Governors of the 50 States. When Congress enacts contingent legislation, it does not "abdicate, or . . . transfer to others, the essential legislative functions with which it is vested by the Constitution, U.S.C.A. Art. 1, sec. 1." *Currin*, 306 U.S. at 15. There is no "delegation of legislative authority" to the actor whose assent is a precondition to the execution of the law. *Id.* ("So far as growers of tobacco are concerned, the required referendum does not involve any delegation of legislative authority. Congress has merely placed a restriction upon its own regulation by withholding its operation . . . unless two-thirds of the growers voting favor it.") (citations omitted).

Congress exercised its legislative authority by enacting IGRA's general prohibition of gaming on after-acquired land, creating an exception to that rule in § 2719(b)(1)(A), and dictating the prerequisites for the application of that

exception. A governor does not enact federal policy by issuing a concurrence, but instead merely waives one legislatively enacted restriction on gaming. Nor does a governor impact federal policy by declining to concur; in that event, IGRA's policy of prohibiting gaming on after-acquired lands remains in force. *See Kentucky Div., Horsemen's Benevolent Ass'n, Inc. v. Turfway Park Racing Ass'n, Inc.*, 20 F.3d 1406, 1416 (6th Cir. 1994) (stating that federal legislation conditioning the legality of off-track betting on the consent of the host racing association does not allow the association to "make the law . . . rather, the veto is merely a condition established by Congress upon the application of Congress' general prohibition of interstate off-track betting").

During oral argument, it became evident that the Tribes' concern is not so much the unconstrained discretion that Congress permitted the Governors of the 50 States to exercise under § 2719(b)(1)(A), but that Congress had delegated any power to the Governors at all. The Tribes conceded that they would not have objected on nondelegation grounds had Congress conditioned the Secretary's power to take land into trust not upon the concurrence of a governor, but rather upon the majority vote of the Indian tribes with reservations encompassed by the state where the proposed trust land is located. In the Tribes' view, the Governor of Wisconsin is an improper delegatee because his administration oversees the Wisconsin State Lottery, which they maintain is in competition with the casinos subject to regulation under IGRA. The Tribes rely on *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936) for the proposition that Congress may not delegate to a private party the power to regulate an industry when the delegatee has "interests [that] may be and often are adverse to the interests of others in the same business."

At issue in *Carter* were certain provisions of the Bituminous Coal Conservation Act of 1935. Under that Act, the largest producers of coal were delegated the power to es-

tablish the maximum hour and minimum wage terms that controlled the entire coal industry. *Carter*, 298 U.S. at 284. In striking down the provision, the Supreme Court was troubled that the statute did not empower "an official or an official body, presumptively disinterested," but instead empowered "private persons whose interests may be and often are adverse to the interests of others in the same business." *Id.* at 311. The Supreme Court concluded that the Act denied the smaller coal producers their "rights safeguarded by the due process clause of the Fifth Amendment," and therefore invalidated the provision at issue. *Id.* at 311-12.

We conclude that the gubernatorial concurrence provision does not raise the concerns presented in *Carter*. The Governors of the 50 States are politically accountable to their constituencies and will therefore be motivated to maximize the public good, contrary to the chief coal producers in *Carter*, whose relationship with minor coal producers was "conflicting and even antagonistic," and whose motivations were self-serving. *See Carter*, 298 U.S. at 311. Even if a particular governor might enjoy ultimate authority over a state lottery or gaming system, that role will surely be eclipsed by the governor's responsibility to regulate the broader state economy.

In conclusion, we find that § 2719(b)(1)(A) does not violate the nondelegation doctrine because it does not entrust to the Governors of the 50 States any legislative power, nor does it violate the principles of *Carter* by wrongfully authorizing a self-interested leader of private industry to regulate its competitors.

## C.

We now address the Tribes' argument that the gubernatorial concurrence provision violates the Appointments Clause. That Clause states that:

> [The President] . . . shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const. Art II. § 2, cl. 2. Any person "exercising significant authority pursuant to the laws of the United States is an 'Officer of the United States' and must, therefore, be appointed in a manner prescribed by § 2, cl. 2 of that Article." *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).

The Tribes contend that a governor is required by § 2719(b)(1)(A) to execute "final decisional discretion on whether and how federal power is exercised," and that this function is sufficiently significant under *Buckley* as to merit the title of "Officer of the United States." Thus, they claim, the gubernatorial concurrence provision violates the Appointments Clause because no governor has been nominated by the President with the advice and consent of the Senate, as is required by Article II, § 2, cl. 2 of all Officers of the United States.

At issue in *Buckley* were certain provisions of the Federal Election Campaign Act which vested the members of the Federal Election Commission ("commissioners") with broad authority, including "recordkeeping, disclosure and investigative functions"; "extensive rulemaking and adjudicative powers"; and the power to "institute a civil action" for the purposes of enforcing the Act. *Buckley*, 424 U.S. at 110. The Supreme Court held that, because the commissioners enjoyed "primary responsibility for conducting civil litigation . . . for vindicating public rights," their "authority . . . cannot possibly be regarded as merely in aid of the legislative function of Congress," but rather extended to typically executive functions of administering and enforcing

the law. *Id.* at 139-40. Therefore, because the Act specified a procedure for appointing the commissioners different from that required by Article II, § 2, cl. 2, the Supreme Court held that the provisions of the Act that conferred authority to the commissioners to execute federal law were in violation of the Constitution. *Id.* at 140.

Unlike the members of the Federal Election Commission in *Buckley*, the Governors of the 50 States do not enjoy power under § 2719(b)(1)(A) to enforce or administer federal law. The power to execute § 2719(b)(1)(A) is entrusted exclusively to the Secretary of the Interior, as only he or she may lift IGRA's general prohibition of gaming on after-acquired land. A governor's role under § 2719(b)(1)(A) is limited to satisfying one precondition to the Secretary of the Interior's authority under § 2719(b)(1)(A) to permit gaming on after-acquired trust land.

Nor is the governor's role under § 2719(b)(1)(A) significant enough to merit the title of an Officer of the United States. An Officer of the United States enjoys more than a merely "temporary, episodic" opportunity to act pursuant to federal law, and instead enjoys a somewhat regular opportunity to issue enforceable decisions. *See Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 877, 881 (1991) (differentiating between special masters whose duties are "temporary" and "episodic" in nature and subject to review, and special trial judges who enjoy regular opportunities to issue final decisions of federal law, holding that only the latter served as Officers of the United States subject to the Appointments Clause). Not only is a governor unable to issue the Secretary of the Interior's final decision regarding an Indian tribe's application under § 2719(b)(1)(A), a governor's opportunity to participate in the administration of IGRA will arise irregularly, if it materializes at all. Moreover, the influence of any one governor is temporary and limited to the particular application under review.

The Tribes argue vociferously that the Governor of Wisconsin is not permitted by any Wisconsin state law to communicate with the federal government regarding proposals to acquire Wisconsin land in trust for the benefit of Indians. Rather, only federal law authorizes the Governor of Wisconsin to respond to the Secretary of the Interior's request for concurrence; in their view, this necessarily imbues the Governor with the role of an Officer of the United States. Notwithstanding the absence of a specific Wisconsin state law authorizing the Governor of Wisconsin to respond to the Secretary of the Interior's request for concurrence, we conclude that the Governor of Wisconsin's role under § 2719(b)(1)(A) is not one that requires appointment in conformity with Article II, § 2, cl. 2.

The text of the relevant portion of the Appointments Clause limits its applicability to Appointments ". . . not herein otherwise provided for, and which shall be established by Law . . ." U.S. Const. Art. II, § 2, cl. 2. In determining whether a particular position is "established by Law," the Supreme Court has considered whether the position's "duties, salary, and means of appointment" are stipulated by federal law. *See Freytag*, 501 U.S. at 881-82. Here, even though federal law requests that the office of the Governor of Wisconsin respond to the Secretary of the Interior's request for concurrence, it is the citizens of Wisconsin, and not Congress, who elect the Governor, pursuant to procedures mandated by the Constitution of the State of Wisconsin. We conclude that the requirements of the Appointments Clause are not triggered by the gubernatorial concurrence provision because that provision neither specifies the "duties, salary, and means of appointment" of any governor, nor does it empower any governor to execute federal law.

Further, we note that the separation of powers concerns underlying the Appointments Clause are not suggested by the gubernatorial concurrence provision. *See Freytag*, 501

U.S. at 878 ("The roots of the separation-of-powers concept embedded in the Appointments Clause are structural and political."). In § 2719(b)(1)(A), Congress did not select the administrator of federal gaming policy in derogation of the President's power to appoint subordinates to aid in the execution of federal law. Rather, Congress directed the Secretary of the Interior, a Presidential appointee, to consult with the chosen representative of the citizens of the States before executing the law. Therefore, we agree with the Ninth Circuit that the governor's concurrence provision does not violate the Appointments Clause. *Confederated Tribes*, 110 F.3d at 698.

### D.

The Tribes seek to persuade this Court that the gubernatorial concurrence provision compels state governors to administer federal law in violation of principles of federalism as interpreted in *New York v. United States*, 505 U.S. 144 (1992) and in *Printz v. United States*, 521 U.S. 898 (1997). In *New York v. United States*, at issue were provisions of the Low-Level Radioactive Waste Policy Amendments Act which required each state to either enact legislation providing for the disposal of locally generated radioactive waste or to take title to and possession of that waste. *New York v. United States*, 505 U.S. at 153-54. The Supreme Court invalidated the provisions at issue, holding that the Tenth Amendment prohibited the federal government from compelling "the States to enact or administer a federal regulatory program." *Id.* at 188. In *Printz*, the Supreme Court applied the rule of *New York* to the Brady Act, a federal statute which required state law enforcement officers to conduct background checks of prospective handgun purchasers. The *Printz* Court held that Congress may no more "command the State's officers . . . to adminis-

ter or enforce a federal regulatory program," than it may command State legislatures to do so. *Printz*, 521 U.S. at 935.

The Tribes contend that the Secretary of the Interior's request for a governor's concurrence pursuant to § 2719(b)(1)(A) is no less offensive to state sovereignty than were the statutes at issue in *New York v. United States* and *Printz*. In their view, § 2719(b)(1)(A) mandates that state governors participate in the federal regulation of property held in federal trust for the benefit of Indians. We disagree. Neither the States nor their Governors are required to aid the federal administration of § 2719(b)(1)(A) in any way. Upon receiving the Secretary of the Interior's request for concurrence, a governor may, consistent with IGRA, willfully ignore it. In that instance, the governor's inaction could not fairly be characterized as the "administ[ration] or enforce[ment] [of] a federal regulatory program" under *Printz. See Printz*, 521 U.S. at 935. In neither *New York v. United States* nor *Printz* were state officials permitted to disregard a federal directive; to the contrary, compliance with the Low-Level Radioactive Waste Policy Amendments Act and the Brady Handgun Violence Protection Act required officers of the States to implement the costly and time-consuming programs that Congress had devised.

The Tribes counter that it is immaterial to the federalism analysis that a governor's role under § 2719(b)(1)(A) is purely voluntary, because even in choosing inaction, a governor will have a "dispositive" impact on IGRA's regulatory scheme. Indeed, if the Secretary of the Interior receives no response from a governor whose concurrence he or she had solicited, the Secretary must deny the application pending under § 2719(b)(1)(A). A governor is thus inescapably ensnared in the execution of federal law, the Tribes argue, and despite a governor's decision to ignore the Secretary of the Interior's inquiry, the result is in violation of principles of federalism under *New York v. United States* and *Printz*.

Despite the impact of gubernatorial inaction under § 2719(b)(1)(A), we conclude that the governor's role under that Section does not violate principles of federalism. *Printz* and *New York v. United States* are concerned with the denigration of state sovereignty that results when Congress forces the States to implement federal policy against their will. Section 2719(b)(1)(A), however, preserves state sovereignty by merely encouraging the States to decide whether to endorse federal policy and by reserving the ultimate execution of that policy to the federal government. That Section neither imposes on the States nor depends on them for the implementation of federal law. Contrary to the view of the Tribes, *Printz* and *New York v. United States* do not prohibit the federal government from seeking the voluntary input of the States in the federal government's execution of federal law.

Nor does the gubernatorial concurrence provision obstruct the political accountability of the dual sovereigns. Because the provision does not require a governor to respond, each governor is solely responsible for the decision to grant, decline, or deny consideration of the request for concurrence. The inability to shift blame to Congress for the decision ensures that a governor will remain attuned to political pressure from his or her constituents. *See New York v. United States*, 505 U.S. at 168 ("Where Congress encourages state regulation rather than compelling it, state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people."). It is only when Congress mandates that state officials devote attention to a particular matter that the local electorate is rendered politically mute. In that instance, as in *New York v. United States*, no amount of lobbying will resonate with local lawmakers because the state's agenda is no longer within their control.

In addition, the procedure under § 2719(b)(1)(A) is transparent, enabling citizens and tribal members of an affected

State to ascertain which sovereign to criticize or laud after a decision has been rendered. For example, if the Secretary of the Interior refrains from soliciting the concurrence of the relevant governor, an applicant tribe will conclude that the Secretary of the Interior found § 2719(b)(1)(A)'s factual predicates wanting. *See Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941 (7th Cir. 2000). Yet, if the Secretary of the Interior issues a favorable finding, but ultimately denies the application, the constituents will gather that the governor likely declined to issue a concurrence, as is demonstrated by the present litigation. Finally, if the Secretary of the Interior takes land into trust pursuant to § 2719(b)(1)(A), tribal members and the citizens of the state where the trust land is located can hold both sovereigns accountable.

Lastly, the Tribes argue that the gubernatorial concurrence provision violates principles of federalism because it impermissibly interferes with the functioning of state government by rearranging its structure. The Tribes submit that the gubernatorial concurrence provision requires the Governor of Wisconsin to enact Wisconsin's public policy regarding gaming on after-acquired trust land, a function which they characterize as legislative. This role violates the Wisconsin Constitution, they argue, because Article IV, § 1 of the Wisconsin Constitution reserves the legislative power to Wisconsin's "senate and assembly." The Tribes believe that when the Secretary of the Interior seeks the concurrence of the Governor of Wisconsin, he or she requires the Governor to legislate Wisconsin's gaming policy in violation of the Wisconsin Constitution.

The Tribes erroneously assume that § 2719(b)(1)(A) vests the Governor of Wisconsin with authority to act outside of the strictures of the gaming policy that Wisconsin has already established through legislation and amendments to the Wisconsin Constitution. In fact, the Wisconsin Constitution and various Wisconsin statutes have already

implemented a fairly complex gaming policy. The Wisconsin Constitution, which originally prohibited the establishment of a lottery, was amended in 1987 to authorize a lottery operated by the State. *See* Wis. Const. Art. VI § 24(6)(A). The lottery is limited in the types of games it may offer. *See* Wis. Stat. § 565.01(6)(m); Wis. Const. Art. IV § 24(6)(c). Other than the state-operated lottery, the Wisconsin Constitution permits gaming only in the following circumstances: bingo and raffle games operated by "religious, charitable, service, fraternal or veterans' organizations," and pari-mutuel wagering and on-track betting. Wis. Const. Art. IV §§ 24(3-5). Notably, casino gambling is not permitted under Wisconsin law.

The establishment of a state lottery signals Wisconsin's broader public policy of tolerating gaming on Indian lands. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202 (1987). In *Cabazon*, the Supreme Court held that a state has no authority to enforce its gaming laws on Indian lands if it permits any gaming activity under state law. *Id.* at 211. Further, because IGRA permits gaming on Indian lands only if they are "located in a State that permits such gaming for any purpose by any person, organization or entity," 25 U.S.C. § 2710(d)(1)(b), the lottery's continued existence demonstrates Wisconsin's amenability to Indian gaming. Although Wisconsin has not been willing to sacrifice its lucrative lottery and to criminalize all gambling in order to obtain authority under *Cabazon* and § 2710(d)(1)(b) to prohibit gambling on Indian lands, Wisconsin once sought (albeit unsuccessfully) to limit Indian gaming to the "identical types of games" authorized for the Wisconsin State Lottery. *See Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, 770 F.Supp 480, 487 (W.D. Wis. 1991) *appeal dismissed for want of jurisdiction*, 957 F.2d 515 (7th Cir. 1992).

The Tribes and the Governor of Wisconsin may not share an opinion of the overriding goal of Wisconsin's gaming

policy, but they must concede that a gaming policy exists. When the Governor of Wisconsin considers the Secretary of the Interior's request for concurrence regarding an off-reservation gaming proposal, he or she will be informed by the public policy represented by the Wisconsin Constitution and relevant statutes. Thus, the Governor's decision regarding any particular proposal is not analogous to creating Wisconsin's gaming policy wholesale—a legislative function—but rather is typical of the executive's responsibility to render decisions based on existing policy. The governor's role is not inconsistent with the Wisconsin Constitution, which vests "the executive power . . . in a governor." Wisc. Const. Art 5, § 1. Further, it is not problematic that the Governor of Wisconsin enjoys discretion within the limitations of Wisconsin's existing gaming policy to render an opinion regarding any particular application under § 2719(b)(1)(A). *See Printz*, 521 U.S. at 927 ("Executive action that has utterly no policymaking component is rare, particularly at an executive level as high as a jurisdiction's chief law enforcement officer.").

Additionally, the Governor of Wisconsin's power to respond to the Secretary of the Interior's request for concurrence is not without a check in the Wisconsin Legislature. Indeed, on two occasions, the Wisconsin Legislature has attempted to curtail the Governor's power to concur. *See* 1999 Wis. Act 9, § 7(q), and 2003 Assembly Bill 144. Although the Legislature did not override the Governor's veto of either bill, the Wisconsin Constitution provides a mechanism for the Legislature to do so. *See* Wis. Const. Art. 5 § 10(2)(a). Moreover, the citizens of Wisconsin could render the gubernatorial concurrence provision a nullity by repealing the Constitutional amendments that sanction gaming in Wisconsin; if Wisconsin prohibited all gaming, § 2710(d)(1) would not permit gaming on Indian lands in Wisconsin, and the Secretary of the Interior would have no occasion to solicit the Governor's concurrence.

In conclusion, we hold that § 2719(b)(1)(A) does not violate principles of federalism by either commandeering the Governors of the 50 States into federal service or by interfering with the functioning of the Wisconsin state government.

E.

We now address the Tribes' argument that the gubernatorial concurrence provision is in violation of the federal government's trust responsibility to Indians. The Tribes submit that the Indian Commerce Clause, U.S. Const. art. I § 8, cl. 3, confers "plenary power to legislate in the field of Indian affairs" to Congress, *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989), but that this power is limited by the federal government's trust obligation to Indians. They argue that all legislation enacted pursuant to the Indian Commerce Clause must be "rationally tied to furthering the federal government's trust obligations." Further, they believe that the gubernatorial concurrence provision does not meet that standard because it delegates to non-trustees the authority to make decisions that effect the administration of Indian affairs. We conclude that Congress's obligation to Indians is not so broad as to require invalidation of the provision at issue.

First, the Tribes argue that the trust doctrine cannot be severed from the Indian Commerce Clause. We disagree. The Supreme Court has acknowledged the "distinctive obligation of trust incumbent upon the Government in its dealings with these dependent and sometimes exploited people," *Seminole Nation v. United States*, 316 U.S. 286, 296 (1942), and the "undisputed existence of a general trust relationship between the United States and the Indian people," *United States v. Mitchell*, 463 U.S. 206, 225 (1983), yet it has not held that this obligation arises from any particular provision of the Constitution. Rather, the trust

relationship arises from the United States' unfortunate history of Indian policy, as is explained in the following paternalistic terms: "[i]n the exercise of the war and treaty powers, the United States overcame the Indians and took possession of their lands, sometimes by force, leaving them an uneducated, helpless and dependent people, needing protection against the selfishness of others and their own improvidence. Of necessity the United States assumed the duty of furnishing that protection . . . ." *Morton v. Mancari*, 417 U.S. 535, 552 (1974) (quoting *Board of County Comm'rs v. Seber*, 318 U.S. 705,715 (1943)). It is the common law, and not the Constitution, that recognized the Indian tribes as "the wards of the nation." *See United States. v. Kagama*, 118 U.S. 375, 384 (1886).

Despite the trust doctrine's lack of foundation in the Constitution, the Tribes seek to persuade this Court that all Indian legislation must be related rationally to furthering the federal government's trust obligation to Indians. In support, the Tribes cite *Delaware Tribal Bus. Comm. v. Weeks*, 430 U.S. 73 (1977) for the proposition that "legislative judgment should not be disturbed '[a]s long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians . . . .'" *Weeks*, 430 U.S. at 85 (quoting *Morton*, 417 U.S. at 555).

In *Morton*, non-Indian employees of the Bureau of Indian Affairs ("BIA") challenged the Indian Reorganization Act on the ground that the preference granted to qualified Indians for employment at the BIA constituted invidious racial discrimination in violation of the Due Process Clause of the Fifth Amendment. *Id.* at 537. The purpose of the employment preference was to "give Indians a greater participation in their own self-government; to further the Government's trust obligation toward Indian tribes; and to reduce the negative effect of having non-Indians administer matters that affect Indian tribal life." *Id.* at 542-43 (internal footnotes omitted). Similarly, in *Weeks*, an Act of Congress

was challenged on the grounds that it denied non-beneficiaries of Indian legislation the equal protection of the laws in violation of the Due Process Clause of the Fifth Amendment. *Weeks*, 430 U.S. 75. At issue in *Weeks* was an authorization by Congress to disburse funds to certain Delaware Indians in order to redress the United States' breach of a particular treaty. *Id.* It was challenged by a group of Delaware Indians who were excluded from the distribution. *Id.*

In both cases, the Supreme Court established that congressional legislation was subject to judicial review "to determine whether it violates the equal protection component of the Fifth Amendment." *Id.* at 919 (citing *Morton*, 417 U.S. 535). The *Morton* Court cautioned, however, that courts must consider the constitutional validity of Indian legislation in the "historical and legal context" of the United States' trust obligation to Indians. *Morton*, 417 U.S. at 553. The Supreme Court noted that "[l]iterally every piece of legislation dealing with Indian tribes . . . single[s] out for special treatment a constituency of tribal Indians," and that if such legislation were to be "deemed invidious racial discrimination, . . . [that] the solemn commitment of the Government toward the Indians would be jeopardized." *Id.* at 552. Thus, in order to preserve Congress's ability to legislate in furtherance of the United States' trust obligation to Indians, the Supreme Court held that "special treatment [that] can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians . . . will not be disturbed." The Supreme Court applied the *Morton* standard to the Fifth Amendment challenge in *Weeks*, and again upheld the Act of Congress at issue on the basis that it was rationally tied to fulfillment of the trust obligation to Indians. *Weeks*, 430 U.S. at 85, 90.

To read *Morton* as requiring that all legislation enacted pursuant to the Indian Commerce Clause be rationally related to the United States' trust obligation to Indians

would be to take the *Morton* rule outside of the limited context in which it arose. Neither *Morton* nor *Weeks* holds that all legislation enacted pursuant to the Indian Commerce Clause be rationally related to the trust obligation. Rather, they hold that courts may not invalidate Indian legislation on the ground that the legislation offends the Due Process Clause of the Fifth Amendment if that legislation was enacted in furtherance of the trust obligation. *See Weeks*, 430 U.S. at 85, 90. In arguing that *all* Indian legislation must comply with the trust doctrine, the Tribes seek to impose a limitation on Congress's plenary power which has no basis in the Constitution and has not yet been recognized by the Supreme Court.

The Supreme Court has not yet invalidated a federal statute on the ground that it did not advance the federal government's trust obligation to Indian tribes. Indeed, even after concluding that an Act of Congress failed to comport with Congress's fiduciary responsibility to Indians, the Supreme Court refrained from acknowledging a cause of action on that ground. *See United States v. Sioux*, 448 U.S. 371 (1980). In *Sioux*, the Sioux Nation challenged the Congressional Act of February 28, 1877 ("the 1877 Act") which had authorized the confiscation of lands that had been pledged by treaty to the Sioux Nation. *Id.* at 374. Before evaluating the Sioux Nation's claim, the Supreme Court sought to answer a preliminary question: had Congress enacted the 1877 Act in its capacity as trustee and guardian of tribal property, or had Congress instead passed the 1877 Act in exercise of its power of eminent domain? *Id.* at 408, 416. The *Sioux* Court endorsed the following test for distinguishing between the two types of Congressional action. If Congress had "made a good faith effort to give the Indians the full value of their lands," then Congress had acted in its fiduciary capacity. *Id.* at 416. In the event that it had not attempted to adequately compensate the Sioux, however, then Congress had exercised its power of eminent

domain and effecting a taking for which just compensation was due under the Fifth Amendment. *Id.* at 408, 416. Notably, the Supreme Court did not hold that Congress violated the trust doctrine by failing to make a "good faith effort" to "transmut[e]" the Sioux Nation's property for property of equal value, even though it acknowledged that a trustee would ordinarily be required to do so when dispensing of the property of her ward. *See id.* at 416. The Sioux Nation prevailed in *Sioux*, but singularly on the ground that 1877 Act effected a taking under the Fifth Amendment. *Id.* at 423-24. Thus, *Sioux* establishes that, in the context of congressional management of Indian land, the trust doctrine imposes no restriction on Congress beyond compliance with the constitutional restrictions which would otherwise constrain Congress's power.

Although *Weeks* states that a court should not refrain "from scrutinizing Indian legislation to determine whether it violates the equal protection component of the Fifth Amendment," *Weeks*, 430 U.S. at 919, the Supreme Court has not yet held that an Act of Congress is subject to invalidation on the ground that it violates the federal government's general trust obligation to Indians. Thus, this Court will not invalidate the gubernatorial concurrence provision on that basis.

## F.

Finally, we address the Tribes' claim that the district court erred in denying their conditional motion to file a second amended complaint. In the event that the court upheld the gubernatorial concurrence provision, the motion requested that the Tribes be permitted to amend their complaint to add a claim that then-Governor McCallum had relied on improper factors when he refused to concur in the Secretary of the Interior's favorable determination. The Tribes submitted the conditional motion and supporting

brief with their reply to the State and federal defendants' cross-motion for judgment on the pleadings.

A "district court's denial of a motion to amend pleadings under Fed. R. Civ. P. 15(a) will be overturned on appeal only if it is shown that the district court abused [its] discretion by refusing to grant the leave without any justifying reason." *J.D. Marshall Intern., Inc. v. Redstart, Inc.*, 935 F.2d 815, 819 (7th Cir. 1991). In this case, the district court denied the motion for leave to amend on the grounds that the Tribes had unduly delayed in bringing the claim and that allowing such an amendment would be a futility.

The Tribes concede that the facts that demonstrate the invalidity of Governor McCallum's withholding of concurrence were known to them when they filed their first amended complaint. In fact, they included those allegations in the first amended complaint, yet they did not assert the invalidity of the Governor's concurrence as a theory of relief at that time. Nor did the Tribes assert the claim in their memorandum in support of judgment on the pleadings. The first time that the Tribes advanced the theory that they now wish to present was in their combined reply brief in support of their motion for judgment on the pleadings and brief in response to the defendants' cross-motions for judgment on the pleadings. The Tribes have not explained their failure to move to amend the complaint prior to that time.

The Tribes have not provided an adequate justification for the delay in stating the claim that they now wish to bring, *see Kleinhans v. Lisle Savings Profit Sharing Trust*, 810 F.2d 618, 625 (7th Cir. 1987), nor have they explained why they failed to argue that claim in their brief in support of their motion for judgment on the pleadings. We therefore conclude that the district court did not abuse its discretion in denying the motion for leave to amend.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the judgment of the district court in favor of the federal and State defendants in all respects.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*