# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

March 27, 2026

Lyle W. Cayce
Clerk

———————

No. 24-60055

———————

GEORGE D. ARNESEN; JEFFREY RYAN BRADLEY,

*Plaintiffs—Appellants,*

*versus*

HOWARD LUTNICK, *Secretary, U.S. Department of Commerce*;
NATIONAL MARINE FISHERIES SERVICE; JANET COIT, *NMFS
Assistant Administrator*; SAMUEL D. RAUCH, III, *NMFS Deputy
Assistant Administrator for* REGULATORY PROGRAMS; GULF OF
MEXICO FISHERY MANAGEMENT COUNCIL, *Et al.,*

*Defendants—Appellees,*

———————————————————————

KAREN BELL; A.P. BELL FISH COMPANY, INC.; WILLIAM
COPELAND,

*Plaintiffs—Appellants,*

*versus*

HOWARD LUTNICK, *Secretary, U.S. Department of Commerce*;
NATIONAL MARINE FISHERIES SERVICE; JANET COIT, *NMFS
Assistant Administrator*,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Southern District of Mississippi
USDC Nos. 1:23-CV-145, 1:23-CV-160

---

Before WIENER, HAYNES, and HIGGINSON, *Circuit Judges*.

STEPHEN A. HIGGINSON, *Circuit Judge*:

One of the fundamental instrumentalities of maintaining our constitutional order is cooperative federalism. The Magnuson-Stevens Act stands as an edifice of this principle. From its inception in 1976, it has enabled cohesive private-public co-management to protect and preserve the viability of our nation's fisheries, above all, by incorporating, state, local, and other stakeholder viewpoints.

This appeal is one of a series of challenges to the Act in recent years. It presents a hybrid question that has not yet been faced by our circuit: whether the members of the Gulf of Mexico Fishery Management Council are properly appointed under the Appointments Clause and, if not, whether the defect implicates the Council's proposed amendment and implementing regulation.

The district court held that the Councilmembers are unconstitutionally serving as officers, but ultimately did not disturb the underlying amendment nor the final regulation for various reasons. We affirm this disposition, but for the reasons discussed below, we do so on alternative grounds.

## I.

Beginning with the background on the Magnuson-Stevens Act (the "Act"), it created a "national program for the conservation and management

of the fishery resources of the United States."[1] 16 U.S.C. § 1801(a)(6). To achieve this aim, the Act prescribes processes for preparing and implementing "fishery management plans," which are tasked with maintaining "the optimum yield from each fishery." *Id.* § 1801(b)(4). The Act established eight Regional Fishery Management Councils to assist in implementing the Act, alongside the Secretary of Commerce, who has ultimate responsibility for carrying out the Act. One of the councils—the Gulf of Mexico Fishery Management Council (the "Council")—is at issue in the present appeal.

Plaintiffs are a group of Greater Amberjack commercial fishers (the "Commercial Fishers"), who have a vested interest in the Council's proposed amendment ("Amendment 54") to the region's fishery management plan. Amendment 54, and its accompanying final regulation (the "Final Rule"), curtailed the catch limit of the Greater Amberjack. The Commercial Fishers sued to enjoin enforcement of Amendment 54 and the Final Rule. They challenge the constitutionality of the appointment of Councilmembers and, in turn, seek enjoinment of actions that originated from the Council. Before turning to the precise issues before us, we explain how the Act operates.

## A.

The Secretary and the councils each play a role under the Act. The Secretary has principal responsibility to regulate fisheries nationally, including:

---

[1] A "fishery" is "one or more stocks of fish which can be treated as a unit for purposes of conservation and management and which are identified on the basis of geographical, scientific, technical, recreational, and economic characteristics" and "any fishing for such stocks." 16 U.S.C. § 1802(13).

> to carry out any fishery management plan or amendment approved or prepared by him, in accordance with the provisions of this chapter. The Secretary may promulgate such regulations, in accordance with section 553 of Title 5, as may be necessary to discharge such responsibility or to carry out any other provision of this chapter.

16 U.S.C. § 1855(d). The councils, in turn, serve as an essential conduit, gathering information from "the States, the fishing industry, consumer and environmental organizations, and other interested persons" who wish to "participate in, and advise on, the establishment and administration of" fishery management plans. *Id.* § 1801(b)(5).

The councils primarily produce proposals for fishery management plans as well as amendments to plans. *Id.* § 1852(h)(1). The plans provide for measures that are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(l). Notably, the councils "develop annual catch limits" for their regional fisheries. *Id.* § 1852(h)(6).

Once complete, a council's proposed or amended plan is given to the Secretary, who reviews the submissions and then releases them for public notice and comment. *Id.* § 1854(a)(1), (b)(1). If the Secretary disapproves of a plan or amendment, the council may submit a revised plan. *Id.* § 1854(a)(4). However, if the Secretary does not notify that council within the requisite timeframe of the necessary fixes to the plan, the plan "shall take effect as if approved." *Id.* § 1854(a)(3). Further, if that council does not develop and submit a plan in a "reasonable period of time" or does not submit a revision of a plan, the Secretary may also draft a plan or amendment without a council proposal. *Id.* § 1854(c).

Fishery management plans or amendments are not self-executing and require the Secretary to issue accompanying regulations. *Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 457 & n.3 (5th Cir. 2020). Similar to the process for fishery management plans, the accompanying implementing regulations may be proposed by either the council or the Secretary. Namely, if the council believes a regulation is "necessary or appropriate" to implement a fishery management plan or amendment, it may submit proposed regulations to the Secretary, which are then reviewed and submitted for public comment (or returned for revisal) before promulgation of a final rule. 16 U.S.C. § 1853(b), (c)(1); *id.* § 1854(b). After the end of the comment period, the Secretary must "promulgate final regulations within 30 days." *Id.* § 1854(b)(3).

Under the Act, the Secretary also has general authority to "promulgate such regulations . . . as may be necessary" to discharge her responsibilities. *Id.* § 1855(d). The Secretary's authority extends to "emergency regulations or interim measures necessary to address [an] emergency or overfishing" when the Secretary finds that "an emergency exists or that interim measures are needed to reduce overfishing." *Id.* § 1855(c)(1).

Notably, the Secretary has delegated administration of the Act to the Administrator of the National Oceanic and Atmospheric Administration ("NOAA"). The NOAA Administrator has in turn delegated that authority to the Assistant Administrator for Fisheries, who leads the National Marine Fisheries Service ("NMFS"), an agency within NOAA. Accordingly, the councils' proposals are given to the NMFS Assistant Administrator, *id.* § 1853(c), who reviews the submissions and then releases them for public notice and comment, *id.* § 1854(a)(1), (b)(1).

No. 24-60055

B.

The Council at issue in this appeal—the Gulf of Mexico Fishery Management Council—is comprised of seventeen voting members.[2]

This lawsuit originated out of the Council's approval of Amendment 54, which modified the fishery management plan pertaining to the Greater Amberjack quota. Since 2003, the Greater Amberjack have been reportedly overfished and subject to a rebuilding plan. *See Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of the Gulf of Mexico; Amendment 54*, 88 FR 39193 (June 15, 2023). This assessment was again confirmed in 2020, and it was estimated that restoring the population was possible by 2027 with reduced yields. *Id.* at 39194. Accordingly, NMFS requested that the Council "prepare and implement a plan amendment or proposed regulations to end overfishing immediately and rebuild the affected stock."

The Council responded by proposing Amendment 54, reducing the annual commercial catch limit by approximately 80 percent for the commercial sector and 74 percent for the recreational sector. Amendment 54, 88 Fed. Reg. 39,193, 39,195 (June 15, 2023) (to be codified at 50 C.F.R. pt. 622). NMFS published Amendment 54 and the Council's proposed

---

[2] Five seats are assigned to "[t]he principal State official with marine fishery management responsibility and expertise in each constituent State." 16 U.S.C. § 1852(b)(1)(A). The governors of Texas, Louisiana, Mississippi, Alabama, and Florida select one official each, and these state officials serve "so long as" they continue to hold the position. *Id.* One seat is assigned to the "regional director of the National Marine Fisheries Service for the geographic area concerned, or his designee." *Id.* § 1852(b)(1)(B). Finally, eleven seats are appointed by the Secretary from a list of recommendations from governors. These members serve for three years and may be removed for cause. *Id.* § 1852(b)(3), (6).

regulations for comment. Subsequently, NMFS issued the unaltered Final Rule.

The Commercial Fishers—comprised of two sets of plaintiffs—sued various parties,[3] asserting that the Final Rule was void because Councilmembers were unconstitutionally appointed. The district court found standing for suit against the Secretary, the NMFS Assistant Administrator, and the Council (collectively, the "government").[4] All plaintiffs sought declaratory and injunctive relief, affirming these constitutional arguments and setting aside the Final Rule. Additionally, the Arneson plaintiffs specifically contended that Councilmembers were improperly insulated from removal. The Arneson plaintiffs also sought further relief—a declaration that Amendment 54 is void and an injunction of the Council from proposing future annual catch limits for the Greater Amberjack fishery. The district court consolidated the two cases.

The Commercial Fishers filed motions for preliminary injunction or summary judgment in the alternative, and the district court granted the government's cross-motion for summary judgment. Finding that

---

[3] George D. Arnesen and Jeffrey Ryan Bradley (collectively, the "Arneson plaintiffs") sued Secretary of Commerce Gina Raimondo; NMFS; NMFS Assistant Administrator Janet Coit; the Gulf of Mexico Fishery Management Council, Samuel D. Rauch, III, who serves on the Council through his role as NMFS Deputy Assistant Administrator for Regulatory Programs; and the Council's individual members. Karen Bell, A.P. Bell Fish Company, Inc., and William Copeland (collectively, the "Bell plaintiffs") separately filed suit against the Secretary and the NMFS and its Assistant Administrator.

[4] The government did not dispute that the Commercial Fishers have standing to sue the Secretary and the NMFS Assistant Administrator. The district court found valid standing against the Council because Amendment 54 formed the basis of the Final Rule, but found there is no standing against Rauch. Rauch signed the Final Rule as "a mere formality," which is a "ministerial action, not substantive," thus the alleged injury is not "fairly traceable" to Rauch.

Councilmembers are inferior officers, the district court determined that, amongst the Council, the five state officials and the regional director were unconstitutionally appointed. The district court also found that the Secretary's inability to remove the five state officials and the eleven gubernatorial-recommended Councilmembers at will is unconstitutional.

But the district court ultimately held that Plaintiffs were not entitled to relief. For one, the NMFS Assistant Administrator, who is authorized to exercise the Secretary's authorities under the Act, independently approved and implemented Amendment 54. As such, the constitutional infirmities in appointment of Councilmembers were not the proximate cause of Plaintiffs' injury. Further, because ten of the eleven secretarially appointed Councilmembers voted for Amendment 54, a quorum of constitutionally appointed officers existed regardless. And finally, as to removal, the district court denied relief because the Commercial Fishers fell short of demonstrating any harm suffered from the alleged unconstitutional removal restrictions.

On appeal, we remanded for the district court to consider in the first instance:

> whether (1) there is jurisdiction to consider Arnesen's requested relief declaring Amendment 54 itself void and enjoining the voting members of the Council from developing further annual catch limits for the greater amberjack fishery in light of the government's contention that judicial review under 16 U.S.C. § 1855(f)(1)–(2) is limited to "[r]egulations promulgated by the Secretary" and "actions that are taken by the Secretary under regulations which implement a fishery management plan," and (2) whether the NMFS Assistant Administrator's review and approval of the Final Rule functioned as a ratification of Council's actions.

On remand, the district court concluded that there is jurisdiction to consider Arnesen's requested relief and that the NMFS Assistant Administrator's implementation of the Final Rule did not constitute a ratification of the Council's actions. The district court then transferred the case back to our circuit, and we have jurisdiction under 28 U.S.C. § 1291.

## II.

We review a district court's grant of summary judgment de novo. *Stults v. Conoco, Inc.*, 76 F.3d 651, 654 (5th Cir. 1996). The parties agree to the underlying facts of the dispute, and we review the constitutional questions presented de novo as well. *See United States v. Rafoi*, 60 F.4th 982, 996 (5th Cir. 2023).

## III.

The Commercial Fishers' challenge is two-fold: they assert that Councilmembers are unlawfully appointed and, in turn, that the Final Rule implementing the Council's Amendment 54 must be set aside. We turn first to the Appointments Clause question, before considering the scope of its impact on the Final Rule.

## A.

The central question presented on appeal is whether Councilmembers are lawfully appointed officers of the United States, or whether they are mere advisors or employees, not subject to the Appointments Clause. To answer, we focus on whether the officials (1) "hold a continuing office established by law," and (2) exercise "significant authority pursuant to the laws of the United States." *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 238 (2018) (quotation omitted).

No. 24-60055

The Councilmembers meet the first element: they have continuous, permanent positions ascribed by the Act. *See* 16 U.S.C. § 1852(b)–(l). Thus, we focus on whether they also exercise significant authority.

On summary judgment, the district court found that Councilmembers are inferior officers. It reached this determination because "[t]he Council wields significant authority throughout," and "is empowered to develop plans and regulations governing the maritime fisheries in its regions." However, the district court recognized "this authority is not unfettered—while the creation of the plans and regulations generally begin with the Council, the Secretary or her designee acts as a check on the legality and direction (the national standards in 16 U.S.C. Section 1851) of those plans and regulations." Because the district court viewed Councilmembers as officers, it proceeded with determining whether the appointments are lawful and what relief may be afforded.[5]

But the "significant authority" test begins and ends our inquiry.

Supreme Court precedent illuminates what authority rises to the level of significant. Officials may have significant authority if they exercise "broad administrative powers," including "rulemaking, advisory opinions, and determinations of eligibility for funds" that are "exercised free from day-to-day supervision." *Buckley v. Valeo*, 424 U.S. 1, 140 (1976) (per curiam). In *Freytag v. Commissioner*, the Supreme Court held that a Tax Court Special Trial Judge ("STJ") exercised significant authority. 501 U.S. 868, 881

---

[5] Finding sixteen of the Councilmembers to be unlawfully appointed inferior officers, the district court considered "whether, because of their inclusion, the past actions of the Council, and specifically Amendment 54 and the promulgation of its Final Rule, are void." The district court's opinion ultimately rested on insufficient proximate cause, finding the Council's composition and its passage of Amendment 54 to not be the proximate cause of the Commercial Fishers' injuries. "Instead, the cause was the decision by the Secretary—through her designee—to fully adopt and implement Amendment 54."

10

(1991). Despite the fact that an STJ's opinion only bears weight if a Tax Court judge adopts the opinion, the Court recognized that STJs "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders," which constitute significant authority of "important functions." *Id.* at 881–82. Likewise, in *Lucia v. Securities & Exchange Commission*, the Court held that administrative law judges ("ALJs") exercise significant authority because they not only "critically shape the administrative record," but they have "potentially more independent effect," considering "the SEC can decide against reviewing an ALJ decision at all." *Lucia*, 585 U.S. 248–49.

Beyond Supreme Court law, a number of cases related to the constitutionality of Councilmembers' authority and appointment have worked their way through our sister circuits. *See Lofstad v. Raimondo*, 117 F.4th 493 (3d Cir. 2024); *Wille v. Lutnick*, 158 F.4th 539 (4th Cir. 2025); *New England Fishermen's Stewardship Ass'n v. Raimondo*, Nos. 25-1212, 25-1213 (1st Cir. argued Mar. 2, 2026). In particular, the Third Circuit addressed a comparable challenge to Councilmembers' authority pursuant to the Act.[6] In *Lofstad v. Raimondo*, a group of commercial fishers challenged the Secretary's approval of the regional council's amendment to its fishery management plan, including a challenge to the councilmembers' appointment. *Lofstad*, 117 F.4th at 497. Judge Bibas, writing for the Third Circuit panel, found that the majority of the powers entrusted to Councilmembers did not confer significant authority. *Id.* at 500. Such powers include proposing plans and amendments and requiring the Secretary to

---

[6] The Third Circuit's opinion was handed down after the district court summary judgment ruling. But the parties' supplemental letters to our court address the case, in addition to their original arguments regarding the scope and limitations on the Council's authority.

consult with the council, but these were not significant because the Secretary ultimately exercises review of the output from the council in these circumstances. *Id.* One type of power, however, did confer significant authority: the pocket veto. *Id.* at 499–500. Finding this power to be severable, the Councilmembers were left with no significant authority, thereby rendering them employees and not subject to the Appointments Clause. *Id.* at 501–02.

The Commercial Fishers here advance that Councilmembers are principal officers because "[t]hey possess last-word authority to bind the Government and regulated parties," and "[o]nly some of their actions are subject to circumscribed agency review." In particular, they challenge five of the Council's powers, and we take each in turn: (1) veto capability; (2) authority to propose plans and amendments; (3) default status of Council decisions; (4) compulsion of secretarial action on emergency regulations; and (5) assembly of the record.

1.

First, and most challenging, is the Council's veto power. Under Section 1854(h) of the Act, the Secretary may only "repeal or revoke a fishery management plan for a fishery under the authority of a Council," with the permission of a supermajority of the Council. 16 U.S.C. § 1854(h). Similarly, if the Secretary wishes to establish a limited-access fishing program for a fishery under the authority of a council, she must obtain the approval of the council. *Id.* § 1854(c)(3).

The Commercial Fishers take issue with the Council's ability to block the Secretary's actions, including the requirement that three quarters of the Council must approve a plan repeal, *id.* § 1854(h), and that a majority of the Council must approve a limited-access fishing program initiated by the Secretary, § 1854(c)(3). The government draws a parallel to limited consent

provisions, which the Seventh Circuit has held fall short of significant authority. *See Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. United States*, 367 F.3d 650, 661 (7th Cir. 2004). A provision of the Indian Gaming Regulatory Act ("IGRA") provides that the Secretary must obtain the state governor's concurrence before taking certain actions. *Id.* But the Seventh Circuit concluded that a true officer "enjoys more than a merely 'temporary, episodic' opportunity to act pursuant to federal law, and instead enjoys a somewhat regular opportunity to issue enforceable decisions," and the governor's participation under IGRA "will arise irregularly, if it materializes at all." *Id.* (quoting *Freytag*, 501 U.S. at 877); *see also Confederated Tribes of Siletz Indians v. United States*, 110 F.3d 688, 697 (9th Cir. 1997) ("The Governor is not given the sole authority for enforcing IGRA. Instead, IGRA requires that the Secretary, a properly appointed Officer of the United States, determine the federal interests in the project.").

Frequency aside, we conclude that veto authority instills Councilmembers with "broad administrative powers." *Buckley*, 424 U.S. at 140. The Third Circuit recognized that the "mere existence of the veto power may shape legislation by deterring expansive measures that might provoke it," and thus the "pocket-veto powers thwart th[e] chain of command." *See Lofstad*, 117 F.4th at 499–500 (citing *The Federalist* No. 73, at 446 (Alexander Hamilton) (Clinton Rossiter ed., 1961)). At base, if Councilmembers "can refuse to let [the Secretary] set up limited-access fisheries, delegate to states, or repeal a plan," they hold a veto that "no one can override." *Id.* Thus, the Council's veto powers do confer significant authority—"enough to make Council members officers, not employees." *Id.*

The remainder of the powers at issue do not rise to the level of significant authority, and we discuss each in turn.

No. 24-60055

2.

Second is the Council's authority to propose plans and amendments. Under Section § 1854(a)(3), if the Secretary rejects a plan or amendment, she must identify and explain "the applicable law with which the plan or amendment is inconsistent." *Id.* § 1854(a)(3)(A). According to the Commercial Fishers, this provision limits the Secretary's discretion to modify the plan or amendment; the Secretary can do so *only if* the plan or amendment conflicts with law. In contrast, the government asserts that the Secretary may disapprove a plan or amendment for any reason—the statute only specifies that, if there is an inconsistency with law, the Secretary must "specify . . . the applicable law with which the plan or amendment is inconsistent." *Id.* In furtherance of this position, the government advances that it would not be coherent to read Congress's intended provision as a reporting requirement that directly limits the Secretary's authority.[7]

We agree with the government's interpretation and follow suit with the Third Circuit in appropriately avoiding an interpretation manifest with a constitutional issue. *Lofstad*, 117 F.4th at 500 (citing *Gomez v. United States*, 490 U.S. 858, 864 (1989)). The Act does not "expressly condition disapproval on a conflict with law." *Id.* To find otherwise would permit reading into the statute additional limitations on the Secretary, who is broadly entrusted under the Act to carry out its purpose. The thrust of the Act is to empower the Secretary to "promulgate such regulations, in accordance with section 553 of Title 5, as may be necessary to discharge such responsibility or

---

[7] The government also contrasts this more ambiguous language with Section 1854(b)(1). That section provides that the Secretary "shall . . . initiate an evaluation of the proposed regulations to determine whether they are consistent with the fishery management plan, plan amendment, this chapter, and other applicable law," and "if that determination is affirmative, the Secretary shall publish" the proposal for public comment. 16 U.S.C. § 1854(b)(1).

No. 24-60055

to carry out any other provision of this [Act]." 16 U.S.C. § 1855(d). Because we read the Act to grant ultimate responsibility to the Secretary for fishery management plans, which includes the power to partially or fully disapprove plans for any reason, the Council's power to propose such plans or amendments does not confer significant authority. *See id.*; *see also Lofstad*, 117 F.4th at 500.

3.

Relatedly, third is the default status of Council plans or amendments. This challenge is two-fold; the default can stem from secretarial inaction as well as the Council's refusal to consult with the Secretary.

For one, under Section 1854(a)(3), if the Secretary does not notify the Council of her approval or any disapproval of a plan or amendment "within 30 days of the end of the comment period," then the "plan or amendment *shall* take effect as if approved." 16 U.S.C. § 1854(a)(3) (emphasis added). The Commercial Fishers' concern is that the final plan or amendment governs the accompanying implementing regulation, pursuant to Section 1854(b)(1). Thus, upon the Secretary's failure to act, the Council's decision is final by default.[8] *Id.* § 1854(b)(1).

The government challenges this position, recognizing Supreme Court and Fifth Circuit precedent regarding the effect of time-related directives on public officials. *See McIntosh v. United States*, 601 U.S. 330, 337–38 (2024)

---

[8] The Third Circuit considered a similar issue in *Lofstad* but declined to reach it due to party presentation. However, the issue presented there was whether the plan or amendment can take effect *without* an implementing regulation. *Lofstad*, 117 F.4th at 500. This would occur if a state enforced the plan itself, under Section 1856(a)(3)(B), and therefore gave it "legal effect without the Secretary's approval." *Id.* That particular challenge is not squarely before us, thus we similarly decline to address whether the intersection of those provisions "could combine to create significant authority." *Id.*

("Time-related directives 'seek speed' by directing 'a judge or other public official' to act by a certain time. Missing that kind of deadline does not deprive the official of 'the power to take the action to which the deadline applies.'" (quoting *Dolan v. United States*, 560 U.S. 605, 611 (2010) (cleaned up))); *Meliezer v. Resolution Tr. Co.*, 952 F.2d 879, 883 (5th Cir. 1992) ("[A] statutory time period is not mandatory unless it both expressly requires an agency or public official to act within a particular time period and imposes a consequence for failure of compliance.").

It may be true that, by failing to notify the Council within 30 days, the Secretary loses the ability to disapprove of the plan or amendment. Nevertheless, we agree with the government that a critical step remains— promulgating the implementing regulations. *See Gulf Fishermens Ass'n*, 968 F.3d at 457 & n.3; *see also Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1464 (9th Cir. 1996) ("[A]pproval . . . of a fishery management plan or amendment does not adversely affect anyone nor can it be considered final agency action."); *N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008) (concluding that fishery management plans "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them"). The Commercial Fishers also misinterpret the reach of Section 1854(b)(1) to require the regulation to be "consistent with the fishery management plan." 16 U.S.C. § 1854(b)(1). That provision only applies to the Secretary's review of regulations proposed by the Council and does not speak to the Secretary's own proposed regulations, which the Commercial Fishers do not appear to challenge. *Id.* If the Council's proposal "takes effect" by default, it is still at the discretion of the Secretary, who maintains the authority to issue the binding regulation.

Further, under Section 1854(b)(3), the Secretary "shall promulgate final regulations within 30 days after the end of the comment period" and "consult with the Council before making any revisions." *Id.* § 1854(b)(3).

The Commercial Fishers contend that the Council can refuse consultation, ultimately forcing the Secretary to publish the Council's proposed regulations as-is, while the government counters that Congress did not hand the Council a pocket veto by directing cooperative consultation between NMFS and the Council. As above, we hew to interpret the statute sensically and in avoidance of constitutional issues. Thus, we agree with the government that this is a procedural requirement and does not grant the Council "a back door to force its proposals into law." *Lofstad*, 117 F.4th at 500.

4.

Fourth, there is the Council's emergency-regulations power. The Act provides that "the Secretary *shall* promulgate emergency regulations or interim measures . . . to address the emergency or overfishing if the Council, by *unanimous* vote of the members who are voting members, requests the taking of such action." *Id.* § 1855(c)(2)(A) (emphasis added). The Commercial Fishers argue that the Council can use discretion in "find[ing] that an emergency exists or that interim measures are needed to reduce overfishing," and thereby compel the Secretary to act and remedy said issue. *Id.* § 1855(c)(2).

In recognition of the unanimous vote requirement, the government echoes the Third Circuit's reasoning, plainly acknowledging that the Council could not compel action that the Secretary is not in support of, because the Secretary's representative on the Council is subject to her direction. *Lofstad*, 117 F.4th at 501 ("[T]he Council cannot force the Secretary to take any particular action. And the Secretary can and does block unanimous votes by having her designee (the Regional Director) vote against all such measures."). We agree—the Secretary's designee on the Council protects this provision from operating as a pocket veto by another name.

5.

Finally, there is the Council's authority to assemble the record for the plan or amendment. The Act requires the Council to specify facts supporting the proposed plan or amendment, 16 U.S.C. § 1853(a), and permits the Council to collect public comments and advisory reports, *id.* § 1852(h)(3), (g)(1)–(3). The Commercial Fishers also rely on the Supreme Court's reasoning in *Lucia*, wherein it concluded that ALJs have significant authority in part because they "rule on the admissibility of evidence," and "thus critically shape the administrative record." 585 U.S. at 248. *Lucia* is distinguishable, however. In that adjudicatory context, ALJ decisions regarding production and management of discovery and evidence confer significant authority because it entirely shapes the basis of any later review. Here, however, the Council's record of support for its proposals does not carry such weight. As discussed, we read the Act to empower the Secretary to consider other information in reviewing and revising plans, amendments, or rules; the Secretary is not confined to solely the Council's proposals nor the Council's basis for its proposals. Absent the adjudicatory context or any further limitation on the Secretary's review, we find no significant authority from this power alone.

B.

Because we find that the Council's power to veto the Secretary's actions confers significant authority, the question remains whether the entire Council structure is tainted.

"In general, when confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem by disregarding the problematic portions while leaving the remainder intact." *United States v. Arthrex, Inc.*, 594 U.S. 1, 23–24 (2021) (internal quotation marks and citation omitted); *see also id.* at 24 (emphasizing that, where there is "a conflict

between the Constitution and a statute, [courts] give 'full effect' to the Constitution and to whatever portions of the statute [that] are 'not repugnant' to the Constitution, effectively severing the unconstitutional portion of the statute." (internal quotation marks and citation omitted)). The government advances this remedy if portions of the Act are deemed to confer significant authority on Councilmembers,[9] although the Commercial Fishers maintain that the remaining powers are significant.

To consider a possible severance, we first ask whether the statute's "surviving provisions [are] capable of 'functioning independently.'" *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 234 (2020) (internal quotation marks and citation omitted); *see also Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 509 (2010) (severing the removal provision). If independent functioning is possible, we determine whether Congress would have enacted the reduced statute, in light of a textual and historical understanding of the statute itself. *See Free Enter. Fund*, 561 U.S. at 509.

Both severance factors are met here. First, the statute remains functioning. By severing any veto powers from the Act, Councilmembers are advisors or employees and not subject to the Appointments Clause. This leaves intact "[t]he Council's 'most significant responsibility' [of] drafting proposed plans." *Lofstad*, 117 F.4th at 501 (quoting *NRDC v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 40 (D.D.C. 2014) (K.B. Jackson, J.)).

---

[9] Following a decision in the District of Maine, now on appeal before the First Circuit, the veto authority was also rendered invalid. *New England Fishermen's Stewardship Ass'n v. Raimondo*, 761 F. Supp. 3d 141, 217 (D. Me. 2024). The government clarified that it does not defend the constitutionality of those provisions "to the extent they could be read to empower Regional Councils to block fishery management and conservation measures that the Secretary wishes to adopt."

And, second, Congress's purpose remains untampered. The Act aimed to provide informed co-management of fisheries, and, vitally, accounting for various stakeholders in the process.[10] The veto power was not essential to this purpose, and thus the Act can stand as a powerful, and highly successful, tool of cooperative federalism. *Cf. Free Enter. Fund*, 561 U.S. at 509 ("Nothing in the statute's text or historical context made it evident that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board whose members are removable at will.").

The government acknowledged that it treated the now-severed veto provisions as advisory "when the Assistant Administrator made an independent decision to promulgate the Final Rule here." Because we conclude that these unconstitutional powers were not used in ultimately recommending Amendment 54, the Final Rule implementing the Amendment need not be vacated either.[11] *See Lofstad*, 117 F.4th at 501.

---

[10] *See* Brief of Gulf of Mexico Reef Fish Shareholders' Alliance and Seafood Harvesters of America as Amici Curiae Supporting Defendants-Appellees at 24 (24-60055) (discussing the "immediate effects of Appellants' 'bulldozer' remedy" as monumental and leading to "[u]ncertainty about how—and even whether—United States fisheries would be conserved and managed for long-term utilization . . . with cascading effects through fisheries and businesses like *Amici*'s that depend upon those fisheries").

[11] We note that the government does not press a standing challenge as to severance of these provisions and, because if the Councilmembers were unlawfully appointed officers it could taint actions derived from the Council, we reach the severed provisions. Additionally, we note that we remanded to the district court to also consider the issue of ratification. Because we conclude that the powers at issue are severable, however, we decline to address whether ratification would cure the issue with respect to Amendment 54. *See Jooce v. Food & Drug Admin.*, 981 F.3d 26, 30 (D.C. Cir. 2020); *Kajmowicz v. Whitaker*, 42 F.4th 138, 153 (3d Cir. 2022); *Wille*, 158 F.4th at 548–49.

No. 24-60055

## C.

The appeal before us also presented questions pertaining to relief requested. By addressing the above findings on the merits, we have cabined the scope of the remedial inquiry. We now consider the Arneson plaintiffs' request for relief from Amendment 54 itself.

The district court held that there is jurisdiction to review both Amendment 54 and the Final Rule implementing it. However, this finding rested on its prior decision, which held that Councilmembers are inferior officers. If Councilmembers were unlawfully appointed officers, it would implicate their actions in proposing Amendment 54 and the Final Rule, which expressly incorporated the amendment.

Because we reach a different conclusion—wherein the severed power renders the Councilmembers mere advisors or employees—we need not address this underlying jurisdictional challenge. Amendment 54 was not unlawfully proposed, nor the Final Rule unlawfully enacted in reliance on the amendment. As the relief provided for under the Act permits judicial review for "[r]egulations promulgated by the Secretary" and "actions that are taken by the Secretary under regulations which implement a fishery management plan," we do not have jurisdiction to consider the requested relief with respect to Amendment 54.[12] 16 U.S.C. § 1855(f)(1)–(2); *see also Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 669–70 (D.C. Cir. 2016) (concluding the court did not have jurisdiction to review the Mid-Atlantic Council's actions, which only constituted "an intermediate step toward final agency action"). Accordingly, our review is limited to the Final Rule, and we

---

[12] Additionally, as noted above, *see supra* n.11, we do not consider the ratification cure nor apply ratification case law developed in other circuits. *See Jooce*, 981 F.3d at 30; *Kajmowicz*, 42 F.4th at 153; *Wille*, 158 F.4th at 548–49.

vacate the district court's order to the extent it permits a challenge to Amendment 54.

## IV.

After consideration of the Appointments Clause challenge, we finally address the removal challenge.

The Arneson plaintiffs appeal the district court's summary judgment finding that they are not entitled to relief from their claims that Councilmembers are unconstitutionally insulated from removal—and that, in particular, Councilmember Strelcheck's removal restrictions are unconstitutional. The district court held that the Arneson plaintiffs did not meet any of the requisite elements of proving they were harmed by an unconstitutional removal restriction and entitled to relief. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Consumer Fin. Prot. Bureau*, 51 F.4th 616, 632 (5th Cir. 2022), *rev'd and remanded on other grounds*, 601 U.S. 416 (2024), *and reinstated in relevant part by* 104 F.4th 930 (5th Cir. 2024) (requiring proof of "(1) a substantiated desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions"). As to even the first factor, the Arneson plaintiffs have made no argument, thus we need not go further in considering this issue on appeal. Accordingly, the claim must fail and we affirm the district court's holding.

## V.

For the foregoing reasons, and on alternative grounds, we AFFIRM the district court's grant of summary judgment in favor of the government.